STATE OF NEVADA, EX REL. WILLIAM E. SWEIKERT, JR., APPELLANT, *v.* WILLIAM BRIARE, MAYOR; CITY OF LAS VEGAS; RON LURIE, MYRON LEAVITT, PAUL CHRISTENSEN AND ROY WOOFTER, CITY COMMISSIONERS; THE CITY COMMISSION AND THE CIVIL SERVICE BOARD OF THE CITY OF LAS VEGAS, CONSISTING OF DON ASHWORTH, AMOS KNIGHTEN, WALTER MARTINI, DR. JOHN MONT- GOMERY AND MELVIN B. WOLZINGER, RESPOND- ENTS.

No. 10453

December 20, 1978

588 P.2d 542

[Rehearing denied February 6, 1979]

*Larry C. Johns,* Las Vegas, for Appellant.

*M. H. Sloan,* City Attorney, and *John H. Howard, Jr.,* Deputy City Attorney, Las Vegas, for Respondents.

## OPINION

By the Court, MANOUKIAN, J.:

Appellant Sweikert was employed by the City of Las Vegas as a building inspector and assigned a specific territory in which to exercise his authority. This territory included the Jolly Trolley Casino, which at the time Sweikert was assigned to that

area, was engaged in some construction work pursuant to building permits already obtained. These permits specified the performance of "interior remodeling" at an estimated cost of $1,100.

The construction project at the Casino was called to Sweikert's attention on November 8, 1976, approximately three weeks subsequent to his assignment to that area. The building permit was not posted at the construction site, and Sweikert requested to see one. A maintenance person who was performing construction work produced the permit. Sweikert radioed his supervisor who confirmed that a permit was issued and that the building contractor was legitimate.

Apparently, however, the Casino personnel produced one of the permits issued for a smaller construction job occurring in the backroom. The construction which Sweikert was investigating was much more substantial in scale, involving the kitchen area and subsequently the dining area. With the exception of this initial inquiry, Sweikert never further ascertained the precise scope of the building permits issued, although he made at least 25 inspections and investigations of the construction during the next two months.

The Casino eventually completed the kitchen area and had knocked a hole into the wall of an adjoining building in which it had an interest. Sweikert was later called to approve the construction. Although the kitchen had no apparent exits to any dining area which it was to service, Sweikert made no inquiry as to the purpose of the kitchen before approving it. Further, the Casino requested Sweikert's approval of the area for occupancy, although there was no indication of precisely what dining area was to be occupied. The Casino told Sweikert that it wanted to turn on the gas and electricity to its large kitchen appliances to check them out and that it was thus necessary for him to approve the construction. Sweikert admitted that it would have been more appropriate to approve the building permit rather than to "approve for occupancy."

Once the Casino had its approval for occupancy, its construction crew worked on a weekend to enlarge the hole into the adjacent building and to convert the adjoining room into a dining area. This construction work resulted in several serious structural and fire hazard defects. Another City employee noticed the defects and advised the supervisors in the City building department who immediately investigated the project to determine why a construction job with such serious defects was approved for occupancy. Sweikert participated in this investigation. On February 4, 1977, he was suspended with pay pending further investigation and one week later was terminated.

Sweikert filed a timely appeal with the City Civil Service Board and a post-termination hearing was held in which Sweikert was represented by counsel. The Board affirmed the termination, and Sweikert sought judicial review in the district court. The lower court remanded the proceedings to the Board for clarification of the permit-issuing process and Sweikert's responsibilities. Another hearing was held, and the district court again assumed jurisdiction. The court held that there was substantial evidence upon which to premise the termination and Sweikert now appeals that decision.

Three issues confront us: (1) Was appellant denied due process; (2) did the lower court err in remanding the matter for further proceedings, and (3) was there substantial evidence to sustain the termination?

1. *Due process claims:* Appellant contends that his constitutional due process rights were violated because he was not afforded a pre-termination hearing, his termination notice did not specify the charges against him, and the findings of fact made by the Civil Service Board were defective.

Any employee who has obtained a property interest in his employment is entitled to due process constitutional protections. Perry v. Sindermann, 408 U.S. 593 (1972); Board of Regents v. Roth, 408 U.S. 564 (1972). Appellant was dismissed for cause. Generally, an employee who can only be discharged for cause has a property right in his employment with the concomitant entitlements to constitutional protections. Bishop v. Wood, 426 U.S. 341 (1976); Arnett v. Kennedy, 416 U.S. 134 (1974).

The inquiry then arises as to precisely what process is due. There are no inflexible rules in the application of this constitutional protection. Due process has a flexibility determined by time, place, and circumstances. Morrissey v. Brewer, 408 U.S. 471 (1972). An employee with a property interest in his employment is entitled by due process to a pre-termination hearing absent extraordinary or exigent circumstances. Fuentes v. Shevin, 407 U.S. 67 (1972).

In the instant case, "extraordinary" and "exigent" circumstances did exist permitting a post-termination rather than a pre-termination hearing. Appellant, as a building inspector, was responsible to assure that construction projects in his assigned area conformed to the building code. The danger to the public from structural collapse and fire hazards are sufficient extraordinary and exigent circumstances to warrant

immediate termination. Here, the subsequent post-termination hearing satisfied due process considerations.

Appellant next claims that the Notice of Termination failed to specify the charges against him. Suffice it to say that the allegations contained in the notice of termination were specific, comprehensive and plainly put appellant on notice of his several purported Civil Service Rule violations. Sweikert concedes that the Notice contains specific allegations, but contends that because he allegedly disproved the specific allegations contained in the Notice of Termination, the remaining general allegations are insufficient to give the required notice. The argument is specious. The adequacy of notice is determined at the time notice is tendered not after a hearing has been held.

Appellant's argument that he in fact rebutted the specific charges is without substance. Sweikert suggests that because he neither inspected nor approved the casino construction, his behavior is not culpable. This contention is unpersuasive. Sweikert, as a building inspector assigned to a specific territory, was responsible for all the construction projects within his territory. He had authority to stop construction on projects not conforming to code or undertaken without building permits, together with authority to approve conforming projects. If his defense were logically extended, a building inspector could be less vigilant, permit construction in defiance of code throughout the city and defend termination allegations with the fact that he neither inspected nor approved the projects.

Sweikert was terminated precisely because he failed to properly inspect and investigate the casino construction project, but he uses this failure as his defense.

Appellant further challenges the findings of fact entered by the Civil Service Board contending the findings are in violation of NRS 233B.125 pertaining to explicit statements of fact. The Administrative Procedures Act, NRS Chapter 233B, is by its terms limited to "all agencies of the executive department of the state government." NRS 233B.020. Even if any of the Act were adopted as establishing guidelines with which to evaluate the Las Vegas Civil Service rule, the findings are factually related. Appellant concedes that finding number five is adequate. That finding is the actual basis and rationale for Sweikert's dismissal and reads:

the illegal construction and code violation noted at the Jolly Trolley Casino occurred during the period of time in which William E. Sweikert, Jr., had the sole and direct responsibility for the construction and the remodeling of

the interior and exterior of the main casino building and the two (2) adjacent buildings.

Sweikert complains that respondent utilized the transcript and findings of fact associated with the hearing on remand rather than the initial hearing. The objection is without merit. Appellant was willing to have the Civil Service Commission reconsider his termination based on the evidence produced at the second hearing. Now after a second unfavorable decision he wishes to utilize only the initial transcript. The court remanded for further proceedings and the transcript of that hearing provides valid evidence. Appellant was not denied any right to due process.

2. *The Remand.* The trial court remanded this matter to the Civil Service Board for further proceedings pursuant to NRS 233B.140. Although the Administrative Procedures Act is not applicable, the district court apparently utilized it as a guide and we find no error in its decision to do so.

3. *Substantial Evidence:* Appellant claims that there was not substantial evidence to warrant his dismissal. However, in addition to our preliminary statement of facts, the record shows that in an area over which Sweikert had complete responsibility, nearly $30,000 of casino construction was completed without permits and in non-conformance to code. There was evidence that while Sweikert initially inquired of his supervisor whether the casino had permits, the record reflects that Sweikert never personally examined the permits to determine the exact scope and approximate value of the construction project. The evidence further shows that Sweikert never made responsible inquiry into the exact nature of the construction project, although he had visited the job site some 27 times during the construction period.

Testimony revealed that Sweikert in the presence of another inspector was not very concerned about the obvious code violations. Most importantly, Sweikert "finaled off" the kitchen construction as "approved for occupancy," although there existed no dining room to occupy. Additionally, there was testimony that over 100 violations existed. Subsequently, the dining area construction involved several serious structural and fire hazards. Appellant even informed construction workers how to build a certain structure which was in violation of code. Sweikert contends that he never inspected and approved the defective construction and thus committed no wrong. The construction, however, occurred in Sweikert's territory and generally while he was making frequent inspections and investigations of the project. Confronted with this devastating

evidence, Sweikert contends that respondents never proved a duty which he allegedly breached. Sweikert's duty, however, was precisely his sole responsibility for all the construction projects in his assigned territory. This Court in No. Las Vegas v. Pub. Serv. Comm'n, 83 Nev. 278, 281, 429 P.2d 66, 68 (1967), stated the scope of judicial review of administrative decisions:

> The function of this court is the same when reviewing the action of the district court in such a matter. Thus neither the trial court, nor this court, should substitute its judgment for the administrator's determination. We should not pass upon the credibility of witnesses or weigh the evidence, but limit the review to a determination that the board's decision is based upon substantial evidence. (Citations deleted.)

There was substantial evidence produced to warrant his termination and the district court correctly upheld the adminstrative decision.

The judgment of the lower court is affirmed.

BATJER, C. J., and THOMPSON, J., concur.

BEKO, D. J.,[1] concurring:

I concur in the result reached by the majority. To avoid the possibility that this opinion be construed to condone or encourage post-termination of employment hearings, I feel compelled to express my reservations.

Admittedly, there are valid grounds, most of which involve moral turpitude, to justify termination of employment without hearing. Such grounds do not appear here. While post-termination procedures may not offend constitutional due process standards, hearings after termination assume the posture of ratification of an accomplished result, completely ignoring any possibility of utilizing less harsh alternatives such as suspension without pay, supplemental training, reassignment to other duties, analysis of job procedures or standards, adequacy of supervision and instruction, etc. I have serious doubts that this result would have been reached if pre-termination hearings had been conducted, on this record.

GUNDERSON, J., dissenting:

The building inspector in question apparently is an experienced, generally capable man. In this instance, he overlooked

---

[1]The Governor designated William P. Beko, Judge of the Fifth Judicial District, to sit in the place of the HONORABLE JOHN MOWBRAY, who was disqualified. Nev. Const. art. 6, § 4.

violations he arguably should have observed; however, I cannot endorse my brethren's statement that "danger to the public from structural collapse and fire hazards are sufficient extraordinary and exigent circumstances to warrant immediate termination" without allowing the inspector a pre-termination hearing. Our attention has been directed to nothing which justifies the conclusion such danger characteristically results from the inspector's work.

For related reasons, it does not appear to me that termination was justified in any event. The inspector's honesty does not appear to be questioned. His culpability is grounded solely in that, in this instance, he arguably should have perceived and reported the violations in question. There is no question but that the City's deficient procedures, apparently corrected now as a result of this case, were in fact the root cause of the entire problem.[1]

---

[1] As appellant's counsel correctly points out in his Opening Brief:

"The question was whether Petitioner was justified in relying upon a premit [sic] supplied him on November 8, 1976, by Dave Berry. Petitioner had called Mr. Hymer [Assistant Supervisor, Division of Building and Safety], on that date and confirmed that there was such a permit for Interior Remodel. Petitioner called Mr. Hymer, which *is* the accepted procedure. (See the very operation Rules # 10 relied upon by the City as well as the testimony of Mr. Bailey and the 4 other inspectors.)

"That it was the very procedures which were defective rather than the Petitioner is admitted in a memo from Mr. Hymer to office personnel dated February 10, 1977. (Appendix Exhibit 7). Although Mr. Hymer denied that Petitioner's circumstance brought about the Memo, Mr. Bailey and everyone else knew that it did. The memorandum stated:

" 'In the past we have not had the full amount of information we need on the commercial permit forms, and plans. This leaves the field inspector more or less in the dark as to the amount of work the permit covers and which plans he is to follow.

Effective February 14, 1977, *no* commercial permits are to be issued which simply states (Interior REmodel).' [sic]

"The new order became effective the day Petitioner was terminated. It is apparent that Petitioner was 'in the dark' relying upon accepted procedures which were inadequate. He had a permit which stated only 'Interior Remodel' (Appendix Exhibit 6). Petitioner cannot be punished for relying upon inadequate permit procedures. The responsibility for any illegal construction falls squarely upon those who adopted and for years operated under defective rules, which could only result in difficulties. But, the inspector 'in the dark' is not the one who should pay with his livelihood."