65 P.3d 956

Eugene GOLONKA, surviving husband of Ruth Bertha Golonka, deceased, on his behalf; and for and on behalf of Carol Chapman, Edward Golonka, Jack Golonka, Laurence Golonka, and Richard Golonka, surviving children of Ruth Bertha Golonka, deceased, Plaintiffs–Appellees,

v.

GENERAL MOTORS CORPORATION, a Delaware corporation, Defendant–Appellant.

No. 1 CA–CV 00–0467.

Court of Appeals of Arizona, Division 1, Department B.

April 1, 2003.

Gallagher and Kennedy, P.A., by Robert W. Boatman, Adam A. Studnicki, Shannon L. Clark and Ulrich and Anger, P.C., by Paul G. Ulrich, Phoenix, Attorneys for Appellee.

Snell and Wilmer, L.L.P, by James R. Condo, Andrew F. Halaby, Todd Feltus and McCutchen, Doyle, Brown and Enersen, L.L.P., by Leslie G. Landau (Admitted pro hac vice), San Francisco, Attorneys for Appellant.

## OPINION

TIMMER, Presiding Judge.

¶1 The family of Ruth Golonka initiated this products liability case against General Motors Corporation ("GM") after Mrs. Golonka was tragically killed when her idling GM truck shifted into reverse and struck her as she stood behind the truck. A jury found GM at fault for negligence and strict liability information defect, and awarded compensatory and punitive damages. GM appeals from the subsequent judgment, arguing that the court erred by denying GM's motions for judgment as a matter of law and for a new trial, and by making certain evidentiary rulings.

¶2 To resolve this appeal, we must answer the following questions, among others: Could the jury have consistently found GM not at fault for strict liability design defect but liable for negligent design? Does Arizona continue to recognize the so-called "heeding presumption" used in information defect cases? How do evidentiary presumptions operate in civil cases? Did the trial court properly apply the heeding presumption in this case? After answering these questions, we decide that the trial court erred by instructing the jury on the heeding presumption. Because this error prejudiced GM's substantial rights, we reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL HISTORY

¶3 On April 17, 1997, Ruth Golonka pulled her 1987 GM Sierra truck in front of her neighbor's curb to load chairs into the truck bed. She attempted to shift her transmission into "park" but, according to GM, misshifted to a position between "park" and "reverse." Before exiting the truck, Mrs. Golonka did not turn off the engine, remove the key, or set the parking brake. Mrs. Golonka walked to the rear of the truck and dropped the tailgate to load the chairs. The truck then shifted into "reverse" and backed over Mrs. Golonka, killing her.

¶4 Mrs. Golonka's husband and children ("Plaintiffs") brought this wrongful death lawsuit against GM based on theories of strict product liability (defective transmission design and an information defect) and negligence (transmission design and failure to warn). Plaintiffs sought both compensatory and punitive damages.

¶5 At the conclusion of the subsequent jury trial, GM moved for judgment as a matter of law ("JMOL") on the non-design aspects of each claim, arguing that Plaintiffs had failed to present evidence that any information defect or failure to warn caused Mrs. Golonka's death. GM also moved for a JMOL on Plaintiffs' request for punitive damages. The court denied both motions.

¶6 The court submitted a single verdict form to the jurors that asked them to check a box to indicate whether GM was "at fault" or

"not at fault" on the negligence claim. The form did not require the jurors to state whether they found GM liable for negligence based on its transmission design, the failure to warn of mis-shifts, or both. Assuming the jurors found GM "at fault" for negligence, they were then instructed to assign percentages of fault between Mrs. Golonka and GM.

¶ 7 Unlike its treatment of the negligence claim, the verdict form distinguished between the two theories underlying Plaintiffs' strict products liability claim. Specifically, the jurors were asked to check a box to indicate whether GM was "at fault" or "not at fault" for the products liability claim alleging defective design. The form then instructed the jurors to check a box to indicate whether GM was "at fault" or "not at fault" for the products liability claim alleging an information defect. Assuming the jurors found GM at fault for either or both claims, they were then instructed to assign percentages of fault between Mrs. Golonka and GM.

¶ 8 The jurors found GM at fault on the negligence claim and assigned 40% of fault to Mrs. Golonka and the remaining 60% to GM. The jurors also found GM at fault on the products liability claim alleging an information defect and assigned 50% of fault to Mrs. Golonka and the remaining 50% to GM. But the jurors found GM not at fault on the products liability claim alleging defective design. The jury awarded compensatory and punitive damages to Plaintiffs. After the trial court denied GM's renewed motion for JMOL and its motion for new trial, this appeal followed.

## STANDARD OF REVIEW

¶ 9 We review de novo the trial court's denial of GM's motion for JMOL. *Monaco v. HealthPartners of S. Arizona*, 196 Ariz. 299, 302, ¶ 6, 995 P.2d 735, 738 (App. 1999); *see* Ariz. R. Civ. P. 50. However, we will reverse the trial court's denial of GM's motion for a new trial only if the court abused its discretion given the record and

circumstances of the case. *Styles v. Ceranski*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App.1996). Likewise, we will not disturb the court's evidentiary rulings unless the court abused its discretion and GM suffered prejudice. *Selby v. Savard*, 134 Ariz. 222, 227, 655 P.2d 342, 347 (1982).

## DISCUSSION

¶ 10 GM argues that the trial court erred by (1) denying GM's motion for JMOL because Plaintiffs failed to prove that any information defect or failure to warn regarding mis-shifts caused Mrs. Golonka's death and (2) denying GM's motion for new trial because a jury instruction incorrectly imposed a burden on GM to disprove that Mrs. Golonka would have heeded any warning about mis-shifts.

¶ 11 Each of these contentions relates solely to the information defect and failure-to-warn theories of liability. But if the negligence verdict was grounded on Plaintiffs' assertion that GM negligently designed the truck transmission, we will affirm regardless of any error relating to the information defect and failure-to-warn theories. *See Murcott v. Best Western Int'l, Inc.*, 198 Ariz. 349, 361, ¶ 64, 9 P.3d 1088, 1100 (App.2000) (holding court will uphold a general verdict if evidence on any one count, issue, or theory sustains the verdict). Thus, before considering the merits of GM's contentions, we must first decide whether the jury could have found GM negligent based on its design of the truck transmission.

### A. Basis of negligence verdict

¶ 12 GM argues that the jury necessarily rejected Plaintiffs' theory of negligent design because it found GM not at fault on the strict products liability claim that was based on defective design. Consequently, GM contends, the jury must have based its negligence verdict on GM's failure to adequately warn Mrs. Golonka about mis-shifts.[1]

---

1. Plaintiffs argue that GM waived this argument by failing to seek either a special verdict or a jury interrogatory that would have revealed the basis for the negligence verdict. We disagree. GM is not challenging the verdicts as defective or ambiguous. *Cf. Mong Ming Club v. Tang*, 77 Ariz. 63, 67, 266 P.2d 1091, 1094 (1954) (holding party waived claims of verdict ambiguity and lack of clarity by failing to present clear and explicit interrogatories). Instead, GM contends

Plaintiffs respond that the design-based theories of recovery are not mutually exclusive, and the jury's rejection of the strict products liability theory did not necessarily reflect a rejection of the negligence theory. In order to resolve this issue, we examine the interplay between these theories.

¶ 13 A manufacturer is strictly liable for injuries caused by use of any product that was in a "defective condition unreasonably dangerous." *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 244, 709 P.2d 876, 878 (1985) (quoting Restatement (Second) of Torts ("Restatement (Second)") § 402A (1965)). Under this theory, the manufacturer can be held liable "despite its best efforts to make or design a safe product." *Mather v. Caterpillar Tractor Corp.*, 23 Ariz.App. 409, 411, 533 P.2d 717, 719 (1975). The courts have developed two models of inquiry to determine whether a product was in a "defective condition unreasonably dangerous": the "consumer expectation test" and the "risk/benefit analysis." *Dart*, 147 Ariz. at 244–45, 709 P.2d at 878–79.

¶ 14 Under the "consumer expectation test," the fact-finder determines whether the product "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonable manner." *Id.* at 245, 709 P.2d at 879 (quoting *Barker v. Lull Eng'g*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)). If so, the product was in a defective condition and unreasonably dangerous. *Dart*, 147 Ariz. at 245, 709 P.2d at 879. The "risk/benefit analysis" asks the fact-finder to decide, in light of relevant factors,[2] whether "the benefits of [a] challenged design ... outweigh the risk of danger inherent in [the] design." *Id.* (quoting *Barker*, 143

Cal.Rptr. 225, 573 P.2d at 446). If not, the design was defective and unreasonably dangerous. *Dart*, 147 Ariz. at 245, 709 P.2d at 879.

¶ 15 The consumer expectation test works well in manufacturing defect cases because consumers have developed safety expectations from using properly manufactured products of the same general design. *See id.* at 244, 709 P.2d at 878. In design defect cases, however, the consumer expectation test has limited utility as "the consumer would not know what to expect, because he would have no idea how safe the product could be made." *Id.* (quoting Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 829 (1973) (citations omitted)). Consequently, when application of the consumer expectation test is unfeasible or uncertain in design defect cases, courts additionally or alternatively employ the risk/benefit analysis to determine whether a design is defective and unreasonably dangerous. *Dart*, 147 Ariz. at 245, 247, 709 P.2d at 879, 881.

¶ 16 In order to succeed on a negligent design claim, a plaintiff must prove that the manufacturer acted unreasonably at the time of design or manufacture in light of the foreseeable risk of injury from use of the product. *Id.* at 246–47, 709 P.2d at 880–81; *see Mather*, 23 Ariz.App. at 411, 533 P.2d at 719 ("Under the negligence theory a 'design defect' arises when the manufacturer has failed to use reasonable care to design its products so as to make it safe for intended uses."). In assessing the reasonableness of the manufacturer's actions at that time, the fact-finder considers the same risk/benefit analysis factors used to determine strict lia-

---

that the verdicts unambiguously reflect the jury's rejection of the negligent design claim. GM raised this contention in a post-trial motion, Plaintiffs responded, and the trial court ruled on the issue. GM sufficiently preserved the issue for our review.

**2.** The supreme court has approved the following non-exhaustive list of factors devised by leading commentator Dean Wade:

"(1) [t]he usefulness and desirability of the product,
(2) the availability of other and safer products to meet the same need,

(3) the likelihood of injury and its probable seriousness,
(4) the obviousness of the danger,
(5) common knowledge and normal public expectation of the danger (particularly for established products),
(6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and
(7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive."
*Dart*, 147 Ariz. at 245–46, 709 P.2d at 879–80 (citing *Byrns v. Riddell, Inc.*, 113 Ariz. 264, 267, 550 P.2d 1065, 1068 (1976) (citation omitted)).

bility. *Dart*, 147 Ariz. at 246, 709 P.2d at 880.

¶ 17 After noting the confusion generated by application of the risk/benefit analysis factors in both strict liability design cases and negligent design cases, the supreme court in *Dart* distinguished the theories. *Id.* The court pointed out that the central focus of inquiry in strict liability design cases is whether the *product* was unreasonably dangerous, while the focus in negligent design cases is whether the manufacturer's *conduct* was unreasonable in light of the foreseeable risk of injury. *Id.* Consequently, in a negligent design case, the risk/benefit analysis factors are used to assess the reasonableness of the manufacturer's choice of design in light of the knowledge available at the time of design or manufacture. *Id.* at 247–48, 709 P.2d at 881–82. In a strict liability design case, however, the knowledge revealed by the accident and the evidence presented at trial is additionally imputed to the manufacturer, and the risk/benefit factors are then applied in "hindsight" to decide whether it was reasonable for a manufacturer with this knowledge to have put the product on the market. *Id.; see Gomulka v. Yavapai Machine & Auto Parts, Inc.*, 155 Ariz. 239, 242, 745 P.2d 986, 989 (App.1987) ("A *negligent* design case focuses on whether the defendant's conduct was reasonable in view of a foreseeable risk at the time of design of the product. A *strict liability* design defect case ... focuses on the quality of the product.").

¶ 18 With the above-explained precepts in mind, we now decide whether the jury's rejection of Plaintiffs' strict liability design claim necessarily reflected a rejection of the negligent design claim. We start by examining the trial court's instructions to the jury on each claim. *See Toner ex rel. Toner v. Lederle Laboratories*, 828 F.2d 510, 512 (9th Cir.1987) ("The consistency of the jury verdicts must be considered in light of the judge's instructions to the jury.").

¶ 19 The court instructed the jury, in pertinent part, as follows:

### Negligence Claim

. . . .

Negligence is the failure to use reasonable care. Negligence may consist of action or inaction. Negligence is the failure to act as a reasonably careful person would act under the circumstances.

. . . .

### Product Liability Claims

. . . .

#### 1. *Claim for Design Defect*

A product is defective and unreasonably dangerous because of a design defect if the harmful characteristics or consequences of its design outweigh the benefits of the design.

A manufacturer or seller is presumed to have known at all relevant times the facts that this accident and this trial have revealed about the harmful characteristics or consequences of the product's design, whether or not the manufacturer or seller actually knew those facts. If you find that it would not be reasonable for a manufacturer or seller, with such presumed knowledge, to have put this product on the market without changing the design, then the product is defective and unreasonably dangerous because of a design defect.

A product is also defective and unreasonably dangerous because of a design defect if it fails to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

The first and second paragraphs of the strict liability design defect instruction required the jury to utilize the risk/benefit analysis and impute "hindsight" to the manufacturer, while the third paragraph sets forth the consumer expectation test.

¶ 20 Plaintiffs argue, and the trial court agreed, that because the court properly instructed the jury to assess GM's *conduct* in deciding the negligent design claim, and instructed the jury to assess the quality of GM's *product* in deciding the strict liability design claim, the claims are distinct, and the jury could have consistently found GM at

fault for negligent design and not at fault for strict liability design defect. We disagree.

¶ 21 We assume the jury followed its instruction to employ a risk/benefit analysis in deciding whether GM was at fault for strict liability design defect. *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 140, 907 P.2d 506, 526 (App.1995) ("We must assume on review that the jury followed the instructions of the trial court."). Therefore, to determine whether GM's transmission was "defective and unreasonably dangerous," the jury first imputed knowledge to GM of all the harmful characteristics of its transmission revealed during the trial, including what was actually known by GM at the time of design or manufacture. The jury then decided whether "it would [have been] reasonable for a manufacturer or seller, with such presumed knowledge, to have put this product on the market without changing the design." By finding GM not at fault for strict liability design defect, the jury necessarily concluded that it would have been reasonable for a manufacturer to have placed GM's transmission into the stream of commerce.

¶ 22 Because the universe of knowledge attributed to GM under the rejected strict liability design claim included what GM actually knew at the time of design or manufacture, it would have been inconsistent for the jury to have found GM at fault for negligent design. Specifically, the jury could not have consistently found that even with the benefit of hindsight, it would have been reasonable for a manufacturer to have placed GM's transmission on the market, yet GM "fail[ed] to act as a reasonably careful person would act under the circumstances" by doing just that. *See Gomulka*, 155 Ariz. at 243, 745 P.2d at 990 (deciding that if plaintiff cannot prove his design defect case in strict liability he cannot prove it in negligence because negligence claim required him to prove elements of strict liability theory plus that defendant knew or should have known product unreasonably dangerous). Thus, in light of our charge to "search for a reasonable way to read the verdicts as expressing a coherent view of the case," *Toner*, 828 F.2d at 512, we decide that the jury necessarily based its

negligence verdict on Plaintiffs' failure-to-warn claim rather than their negligent design claim.

¶ 23 The Ninth Circuit's decision in *Toner*, relied on by Plaintiffs, does not persuade us to reach a different result. In that case, plaintiff Toner had been paralyzed after being vaccinated with Tri–Immunol, a vaccine manufactured by defendant Lederle. *Id.* at 511. Toner asserted claims against Lederle for negligence, strict products liability, and breach of warranty, primarily contending that Lederle had failed to develop and market Tri–Solgen, an alternative and safer vaccine. *Id.* Lederle asserted that it was immunized from liability because Tri–Immunol, like other drugs, is unavoidably unsafe and it is therefore permissible to market that drug despite its inherent risks. *Id.; see* Restatement (Second) § 402A cmt. k (recognizing defense to strict liability claims under certain conditions for manufacturers of unavoidably unsafe products). The trial court instructed the jury to follow the consumer expectation test in deciding whether Tri–Immunol was in a "defective condition, unreasonably dangerous." *Toner*, 828 F.2d at 513. In special verdicts, the jury rejected Toner's strict liability and breach of warranty claims but awarded damages on the negligence claim. *Id.* at 511.

¶ 24 On appeal, Lederle argued that the jury's rejection of Toner's strict liability claim necessarily meant that any defect in Tri–Immunol was unavoidable, which was fatally inconsistent with a finding that Lederle was negligent in its manufacture or distribution of the vaccine. *Id.* To resolve the issue, the Ninth Circuit examined both Idaho law and the trial court's instructions to the jury. *Id.* at 513. The court noted that under Idaho law, a plaintiff may proceed under a negligence cause of action even if the "unavoidably unsafe" defense immunizes a manufacturer from strict liability. *Id.* at 512. Consequently, and in light of the instruction to the jury on the consumer expectation test, the court held that the verdicts were consistent because "[i]t is reasonable to read the special verdicts as saying that Lederle's failure to develop the Tri–Solgen vaccine was unreasonable conduct, although

the danger posed by the product [Tri–Immunol] itself was not greater than an ordinary consumer would reasonably expect." *Id.* at 513.

¶ 25 *Toner* is distinguishable from the case before us because the jury in *Toner* was only instructed to apply the consumer expectation test in determining whether Tri–Immunol was in a defective condition and unreasonably dangerous. Because the court did not instruct the jury to employ a risk/benefit analysis, the jury did not decide that with the benefit of hindsight Lederle failed to act as a reasonably careful person would act under the circumstances by placing Tri–Immunol on the market. Thus, the Ninth Circuit was not faced with reconciling such a decision with the jury's acceptance of Toner's claim that Lederle acted unreasonably by placing Tri–Immunol on the market. The lack of a risk/benefit analysis jury instruction in *Toner* distinguishes that case from the one before us.

■■■ ¶ 26 Finally, we reject Plaintiffs' contention that the jury could have consistently rejected the strict liability design claim and accepted the negligent design claim based on a finding that GM's transmission design was "state of the art." *See* Ariz. Rev.Stat. ("A.R.S.") § 12–683(1) (1992) (providing affirmative defense to products liability claim based on inadequate design if design state of art at time product first sold by

manufacturer). The court instructed the jury that the "state of the art" defense applied equally to both the strict liability design and negligent design claims. Consequently, if the jury found the defense applicable to shield GM from fault under the strict liability design claim, the jury could not have consistently rejected the defense by finding GM at fault for negligent design.

■■■ ¶ 27 In summary, when a plaintiff's claims for strict liability design and negligent design are factually identical, and the jury employs a risk/benefit analysis to determine that the manufacturer is not at fault for strict liability design, the jury cannot consistently find the product manufacturer at fault for negligent design.[3] Because that is the scenario in this case, the jury's negligence verdict was necessarily predicated on Plaintiffs' failure-to-warn theory. Thus, GM's arguments relating to that theory are viable, and we now address them.

## B. Denial of JMOL on failure-to-warn claims

■■■ ¶ 28 GM argues that the trial court erred by denying the motion for JMOL on the failure-to-warn claims because Plaintiffs did not prove that any deficiency in GM's warnings caused Mrs. Golonka's death. To prove causation, Plaintiffs were required to present evidence that if GM had issued a proper warning, Mrs. Golonka would have

---

3. In light of the court's instruction, the jury in this case also employed the consumer expectation test to reject Plaintiffs' strict liability design claim. But because the jury also employed the risk/benefit analysis to reject the strict liability design claim, we need not decide whether a jury could consistently reject such a claim using the consumer expectation test, yet accept a factually identical negligent design claim. We note, however, that courts from other jurisdictions and commentators have opined that a jury cannot under any circumstances consistently reject a strict liability design claim and accept a negligent design claim. *See, e.g., Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150–51 (6th Cir.1996) (holding jury verdict legally inconsistent in products liability case alleging defective design of tire when jury found tire not unreasonably dangerous for purposes of strict liability claim but found manufacturer failed to exercise ordinary care in design for purposes of negligence claim; both claims required existence of defective product); *Sexton ex rel. Sexton v. Bell Helmets, Inc.*, 926

F.2d 331, 335 (4th Cir.1991) ("[W]hen a product liability claim is based on a design defect, the articulation of liability, whether based on a negligent breach of a duty of care or on strict liability, reduces to the single question of whether the product was defective."); *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257 (5th Cir.1988) ("[A]lthough a negligence claim requires a different showing from a strict liability claim, a manufacturer logically cannot be held liable for failing to exercise ordinary care when producing a product that is not defective ...."); *see also* Restatement (Third) of Torts: Products Liability ("Restatement (Third)") § 2 cmt. n (1998) ("Regardless of the doctrinal label attached to a particular claim, design ... claims rest on a risk-utility assessment. To allow two or more factually identical risk-utility claims to go to a jury under different labels, whether 'strict liability,' 'negligence,' or 'implied warranty of merchantability,' would generate confusion and may well result in inconsistent verdicts.").

taken precautions to avoid the accident. *Gosewisch v. Am. Honda Motor Co.*, 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987) (superseded by A.R.S. § 12–683 (1992) with respect to affirmative defenses). Although causation is ordinarily a question of fact for the jury, *id.* at 404, 737 P.2d at 380, GM contends that because no properly admitted evidence demonstrated that Mrs. Golonka would have heeded a different or better warning about mis-shifts, the court should have granted a JMOL in favor of GM on the warnings claims. Plaintiffs counter that they satisfied their burden of proof by introducing admissible evidence that Mrs. Golonka would have heeded a proper warning, and the trial court therefore properly denied the motion for JMOL.[4]

¶ 29 GM contends that we should follow the supreme court's decision in *Gosewisch*, which affirmed the trial court's refusal to give a warnings instruction in a products liability case because the plaintiff had failed to introduce any evidence that the alleged defective warning had caused plaintiff's injury. 153 Ariz. at 405, 737 P.2d at· 381. But unlike the situation in *Gosewisch*, Plaintiffs in this case introduced causation evidence.

¶ 30 GM engineer Robert Lange testified that an audible warning of mis-shifts was feasible in the 1970s and could have been installed in GM vehicles from that time forward. Plaintiffs also provided the jury with GM engineer Roger McCarthy's testimony in a similar case that a person would react with "surprise and shock" and "investigate" the first time he or she heard an audible warning or saw flashing lights triggered by a mis-shift, although that person might ignore such warnings if repeated multiple times. Plaintiffs' expert witness, Dr. Mark Sanders, opined that an audible warning of a mis-shift would be "very effective."

¶ 31 Reasonable persons could infer from this evidence that an audible warning system would have alerted Mrs. Golonka to a mis-shift before she walked behind the truck and dropped its tailgate, and that the warning would have caused her to take action to prevent the accident. *Masaki v. General Motors Corp.*, 71 Haw. 1, 780 P.2d 566, 580 (1989) ("It was a question for the jury to decide whether a blaring horn and flashing light would have caused Masaki to discover the danger and thereby have prevented the accident.").

¶ 32 Plaintiffs also introduced evidence that GM could have issued better warnings in its owner's manual, or by sending warning letters or on-product labels to customers. According to Dr. Sanders, a warning label about mis-shifts affixed to the visor or steering column, or a separate warning letter, "would have definitely increased the probability that [Mrs. Golonka] would have taken appropriate action." This evidence supported a conclusion that a different or better written warning would have prevented Mrs. Golonka's death.

¶ 33 Finally, Plaintiffs introduced evidence that Mrs. Golonka had read portions of the owner's manual for the 1987 Sierra truck, had heeded the truck's "service vehicle soon" light when activated, and had heeded safety warnings for other products. The jury could have reasonably inferred from this evidence that Mrs. Golonka was safety conscious and would have heeded a better warning about mis-shifts. GM argues that we should not consider this evidence because the trial court erred by denying a motion *in limine* to preclude it as inadmissible character evidence. Ariz. R. Evid. 404(a) ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion. . . ."). Plaintiffs countered at trial that the evidence demonstrated Mrs. Golonka's habit of heeding safety warnings and was therefore admissible. Ariz. R. Evid. 406 ("Evidence of the habit of a person . . . is relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit. . . ."). After

---

4. Plaintiffs additionally contend that the court properly denied GM's motion for JMOL because the jury was entitled to presume that Mrs. Golonka would have heeded a proper warning. As explained, *infra* ¶¶ 52–54, Plaintiffs lost the bene-

fit of this presumption once GM presented credible evidence controverting the presumed fact. Therefore, we consider only the presented evidence to decide whether the trial court properly denied the motion for JMOL.

argument on the motion, the court informed GM that a ruling would not be immediately forthcoming and that GM "should proceed as it deems appropriate" and could recall a witness after the ruling to elicit any testimony affected by the ruling. Regardless, GM chose to elicit testimony about Mrs. Golonka's failure to heed warnings and did not object to Plaintiffs' questions about Mrs. Golonka's adherence to other warnings.

¶ 34 Eventually, the trial court denied GM's motion *in limine*, ruling that GM had waived the issue by its conduct. Because the court had not ruled on the motion *in limine* at the time both parties elicited competing testimony about Mrs. Golonka's treatment of safety warnings, the court did not abuse its discretion by denying the motion based on waiver.[5] *See State v. Burton*, 144 Ariz. 248, 250, 697 P.2d 331, 333 (1985) ("[W]here a motion in limine is made *and ruled upon*, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial.") (emphasis added); *cf. Laplace–Bayard v. Batlle*, 295 F.3d 157, 164 (1st Cir.2002) (holding plaintiffs "proceeded at their [own] peril" by referencing to jury anticipated expert testimony that was subject of pending motion *in limine* ).

¶ 35 Plaintiffs introduced sufficient evidence of causation to submit the warnings claims to the jury. Consequently, the trial court did not err by denying GM's motion for JMOL.

### C. Jury instruction on heeding presumption

¶ 36 GM next argues that the trial court erred by instructing the jury on the so-called "heeding presumption." We will reverse on this basis only if the instruction was both erroneous and prejudicial to GM's substantial rights. *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 504, 917 P.2d 222, 233 (1996). "A jury verdict cannot stand

if the instructions given create substantial doubt as to whether or not the jury was properly guided in its deliberations." *Id.* (quoting *Melancon v. USAA Cas. Ins. Co.*, 174 Ariz. 344, 347, 849 P.2d 1374, 1377 (App. 1992)).

¶ 37 The "heeding presumption" is a rebuttable presumption used in a strict liability information defect case to allow the factfinder to presume that the person injured by product use would have heeded an adequate warning, if given. *Dole Food Co. v. N. Carolina Foam Indus., Inc.*, 188 Ariz. 298, 305, 935 P.2d 876, 883 (App.1996). The presumption is useful to plaintiffs in such cases, as it might otherwise be difficult to demonstrate how an injured or deceased person would have reacted to a given warning. *See Reyes v. Wyeth Laboratories, Inc.*, 498 F.2d 1264, 1281 (5th Cir.1974) (reasoning that without heeding presumption plaintiff would be left with providing speculative and self-serving testimony); *Coffman v. Keene Corp.*, 133 N.J. 581, 628 A.2d 710, 719 (1993) (recognizing heeding presumption eases difficulty of showing absence of warning was substantial factor in causing injury).

¶ 38 The trial court instructed the jury on the heeding presumption as follows:

Where a warning is given, a seller may reasonably assume that it will be read and heeded. If you find the warning is adequate, then your verdict must be for Defendant on this claim. However, if you find the warning to be inadequate, then you must start with the presumption that an adequate warning would have been read and heeded. In those circumstances, the Defendant then has the burden of proving that it is more probably true than not that an adequate warning would not have been read or would not have been heeded.

You may consider all the evidence presented in this case to make that determina-

---

5. The trial court's denial of the motion *in limine* was additionally warranted because GM had placed at issue Mrs. Golonka's propensity for heeding safety warnings, presumably in an attempt to rebut the heeding presumption. *See infra* ¶¶ 37, 39–44 for a discussion of the heeding presumption. GM could not simultaneously rebut the heeding presumption by introducing evi-

dence that Mrs. Golonka had ignored safety warnings and then object to Plaintiffs' countervailing evidence that Mrs. Golonka had heeded safety warnings. *Bell v. State*, 143 Ariz. 305, 308, 693 P.2d 960, 963 (App.1984) ("Character evidence may be offered in a civil case to prove character when it is 'in issue.' ").

tion. If you find the Defendant has proved that an adequate warning would not have been read or heeded, then your verdict must be for Defendant on this claim. If you find that Defendant has not proved that an adequate warning would not have been read or heeded, then you may return a verdict for Plaintiff on this claim if you find that Plaintiff has proved the other elements of this claim.

GM contends the court erred in giving this instruction because (1) the heeding presumption is not utilized in Arizona, (2) even if the presumption is utilized, it is inapplicable in this case, and (3) the instruction incorrectly shifted the burden of persuasion to GM concerning causation. We address each contention in turn.

### 1. The heeding presumption in Arizona

¶ 39 In *Dole Food*, 188 Ariz. at 305–06, 935 P.2d at 883–84, this court recognized and applied the heeding presumption to reverse entry of summary judgment in a strict liability information defect case. The court described the presumption as springing from comment j to Restatement (Second) § 402A.[6] *Id.* at 305, 935 P.2d at 883. Because comment j has been highly criticized by commentators and was ultimately dropped from the Restatement (Third) of Torts, GM argues that the heeding presumption is no longer viable in Arizona. *See* Restatement (Third) § 2, Reporters' Note, cmt. 1 (characterizing comment j as containing "unfortunate language" that "has elicited heavy criticism from a host of commentators").

¶ 40 GM overlooks the fact, however, that courts have adopted the heeding presumption without reference to comment j. *See*

*Coffman*, 628 A.2d at 720 (citing numerous cases for this proposition). In *Sheehan v. Pima County*, 135 Ariz. 235, 238, 660 P.2d 486, 489 (App.1982), the court described the heeding presumption as a presumption of due care "founded on a law of nature and has for its motives the fear of pain, maiming and death." (Citing *Davis v. Boggs*, 22 Ariz. 497, 508, 199 P. 116, 120 (1921)); *cf. Englehart v. Jeep Corp.*, 122 Ariz. 256, 259, 594 P.2d 510, 513 (1979) (recognizing presumption of due care in products liability case, although presumption rebutted). While this foundation for the heeding presumption may be shaky in light of the increasing number of warnings in our society that are routinely ignored,[7] sound public policy and procedural convenience reasons exist for use of the presumption. *See Silva v. Traver*, 63 Ariz. 364, 373, 162 P.2d 615, 619 (1945) (acknowledging that evidentiary presumptions can stem from policy and procedural convenience rather than from logic), *overruled on other grounds, Reed v. Hinderland*, 135 Ariz. 213, 660 P.2d 464 (1983).

¶ 41 Strict tort liability stems in significant part from a public policy that seeks to achieve safety in the marketplace by providing a disincentive to manufacturers to place defective and unreasonably dangerous products into the stream of commerce. *Salt River Project Agric. Improvement and Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368, 375–76, 694 P.2d 198, 205–06 (1984) (citations omitted). The courts are therefore concerned with deterring the distribution of products bearing information defects as well as compensating victims. *See id.* (citation omitted); *Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.*, 136 Ariz. 444, 447, 666

---

**6.** Comment j provides: "Where a warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." As noted by the *Dole Food* court, although comment j concerns what a seller may presume, courts have held that the presumption "works both ways" and may be used to show that an injured party would have heeded an adequate warning. 188 Ariz. at 305, 935 P.2d at 883.

**7.** *See Coffman*, 628 A.2d at 717, wherein the New Jersey Supreme Court reasoned that the heeding presumption is not a "natural" or "logical" pre-

sumption. Such presumptions are created when, "based on common experience, [an] empirically demonstrable probability exists that [the] presumed fact flows logically from the underlying fact." *Id.* (citing *Lionshead Woods v. Kaplan Bros.*, 243 N.J.Super. 678, 581 A.2d 137 (Law Div.1990)). After the defendant in the *Coffman* case cited studies in its brief, pointing out that with the proliferation of health and safety warnings in our society, it is nearly impossible to go through a day without consciously ignoring them, the court concluded that the heeding presumption is not firmly based on a probability that people naturally obey warnings. *Id.*

P.2d 544, 547 (App.1983) (recognizing tort remedies designed to protect public from dangerous products). The specter of a strict liability information defect judgment provides a strong incentive for manufacturers to adequately warn consumers about hidden dangers linked with product use. *See Salt River Project*, 143 Ariz. at 375–76, 694 P.2d at 205–06.

¶ 42 In light of the difficulty of demonstrating how an injured or deceased person would have reacted to a particular warning, *see supra* ¶ 37, manufacturers who issue products with inadequate safety warnings could escape any consequence, thereby decreasing the incentive for manufacturers to adequately warn consumers of dangers inherent in product use. By easing the burden of proving causation, "[t]he use of the heeding presumption provides a powerful incentive for manufacturers to abide by their duty to provide adequate warnings." *Coffman*, 628 A.2d at 718; Benjamin J. Jones, Annotation, *Presumption or Inference, in Products Liability Action Based on Failure to Warn, That User of Product Would Have Heeded an Adequate Warning Had One Been Given*, 38 A.L.R. 5th 683 (stating that when adequate warning not provided, some jurisdictions use heeding presumption because it advances public policy purpose of encouraging adequate warnings of inherent danger and risk).

¶ 43 Additionally, use of the heeding presumption is often procedurally desirable. Specifically, the presumption assists plaintiffs in proving causation in cases in which the injured person has either died or has become incapacitated, and evidence of how that person would have reacted to an adequate warning is therefore limited or unavailable. *General Motors Corp. v. Saenz ex rel. Saenz*, 873 S.W.2d 353, 359 (Tex.1993). Additionally, use of the presumption prevents the need for the fact-finder to speculate about whether the injured person would have heeded an adequate warning. *Coffman*, 628 A.2d at 719 (citation omitted); *Payne v. Soft Sheen Prod-*

*ucts*, 486 A.2d 712, 725 (D.C.1985) (noting without heeding presumption jury would often engage in speculation).

■ ¶ 44 In summary, use of the heeding presumption in strict liability failure-to-warn cases furthers Arizona's policy of protecting the public from defective and unreasonably dangerous products. The presumption is also procedurally desirable to ensure that legitimate claims of information defect are fairly addressed. For these reasons, the heeding presumption is viable in Arizona.

## 2. Applicability of heeding presumption in this case

¶ 45 GM next argues that even assuming the viability of the heeding presumption in Arizona, the trial court erred in instructing the jury on it because the presumption dissipated in the face of evidence supporting a finding that Mrs. Golonka would not have heeded an adequate warning about misshifts. GM relies on this court's decision in *Sheehan v. Pima County*, which determined that if the heeding presumption existed in that case, it "disappear[ed] entirely upon the introduction of any contradicting evidence" and the existence of the previously presumed fact must be determined exactly as if no presumption existed. 135 Ariz. at 238, 660 P.2d at 489 (citation omitted).

■ ¶ 46 Plaintiffs do not address *Sheehan* in their answering brief,[8] but instead cite this court's decision in *Dole Food Co. v. North Carolina Foam Ind., Inc.*, to support their contention that the heeding presumption permanently shifts the burden to the manufacturer to prove that the injured person would not have heeded an adequate warning. In *Dole Food*, the court explained that the effect of the heeding presumption in that case was "to take the case to the jury, even in the face of [the manufacturer's] contrary evidence" that an adequate warning would not have been heeded. 188 Ariz. at 306, 935 P.2d at 884. Additionally, the court

8. During oral argument, Plaintiffs argued that the language from *Sheehan* relied upon by GM is dicta, which we should ignore. We disagree with Plaintiffs' characterization. The *Sheehan* court's description of the effect of the presump-

tion was essential to the determination of the case and was therefore not dicta. *See Clark Equip. Co. v. Arizona Prop. & Cas. Ins. Guar. Fund*, 189 Ariz. 433, 442, 943 P.2d 793, 802 (App.1997).

stated that "the presumption shifts the burden of proof to [the manufacturer], and it is up to the jury to determine whether the burden has been satisfied." *Id.* The trial court relied on *Dole Food* in instructing the jury on the heeding presumption.

¶ 47 To resolve the conflict between *Sheehan* and *Dole Food,* we examine the operation of presumptions used in civil cases in Arizona. Thereafter, we decide how the heeding presumption operates and whether the court correctly instructed the jury on the presumption in this case.

¶ 48 In 1938, the Arizona Supreme Court adopted the "bursting bubble" theory of presumptions championed by Harvard Law Professor James B. Thayer. *See Seiler v. Whiting,* 52 Ariz. 542, 547–48, 84 P.2d 452, 454–55 (1938); *Silva,* 63 Ariz. at 369–70, 162 P.2d at 617–18. Under this theory, the existence of the presumed fact is assumed unless the party against whom the presumption operates meets the burden of production or proof imposed by the presumption. *State v. Grilz,* 136 Ariz. 450, 456 n. 3, 666 P.2d 1059, 1065 n. 3 (1983) (discussing and applying presumptions from civil cases in a criminal context).[9] In such cases, even if the fact-finder might disbelieve the rebuttal evidence, the "bubble is burst," and the existence or non-existence of the presumed fact must be determined as if the presumption had never operated in the case. *Id.* at 455, 666 P.2d at 1064; *see also Silva,* 63 Ariz. at 369–70, 162 P.2d at 617–18

(citation omitted). The trial court rather than the jury determines whether the party opposing the presumed fact has presented sufficient evidence to destroy the presumption. *Grilz,* 136 Ariz. at 456, 666 P.2d at 1065; *Silva,* 63 Ariz. at 370, 162 P.2d at 617–18. If the presumption is rebutted, the court should not refer to the presumption in jury instructions, although the jury may still draw reasonable inferences from the facts originally giving rise to the presumption. *Grilz,* 136 Ariz. at 455–56, 456 n. 3, 666 P.2d at 1064–65, 1065 n. 3; *McCormick on Evidence, supra* note 9, at § 344(A) (stating natural inferences from facts underlying presumption may be sufficient to take case to jury even when presumption defeated by contrary evidence).

¶ 49 Although the supreme court has consistently applied the "bursting bubble" theory to its treatment of presumptions,[10] it has not differentiated between the types of presumptions that shift the burden of production from those that shift the burden of persuasion to the party opposing the presumption. *See* Joseph M. Livermore, et al., *Arizona Practice, Law of Evidence* § 301.4, at 50 (4th ed.2000) (noting that Arizona statutes and cases have created hundreds of evidentiary presumptions that either shift the burden of production or the burden of persuasion or have undetermined effects). Similarly, the Arizona Rules of Evidence, unlike their federal counterpart,[11] are silent on the subject. Thus, discerning the quantum of evidence

---

9. By deciding that the presumption dissipates when the opponent has met "the burden of production or proof imposed by the presumption," the *Grilz* court adopted a somewhat modified approach to the "bursting bubble" theory, which typically serves to shift only the burden of production. 2 J.W. Strong, *McCormick on Evidence,* § 344(A) (4th ed.1992) [hereinafter *McCormick on Evidence* ]. Thus, if a presumption shifts the burden of persuasion, in order to destroy that presumption, its opponent must necessarily introduce a sufficient quantum of evidence contradicting the presumed fact to persuade the court of the non-existence of that fact. *See v. Grilz,* 136 Ariz. at 456 n. 3, 666 P.2d at 1065 n. 3.

10. The supreme court has reaffirmed use of the "bursting bubble" theory for both statutory and non-statutory presumptions. *Grilz,* 136 Ariz. at 455–56, 456 n. 3, 666 P.2d at 1064–65, 1065 n. 3; *see also Englehart,* 122 Ariz. at 259, 594 P.2d at 513 (presumption of due care); *Helton v. Indus.*

*Comm'n,* 85 Ariz. 276, 278–79, 336 P.2d 852, 853 (1959) (unexplained death presumption) (citation omitted); *State Tax Comm'n v. Phelps Dodge Corp.,* 62 Ariz. 320, 329–30, 157 P.2d 693, 697 (1945) (statutory presumption regarding accuracy of tax assessments), *overruled on different grounds, Mohave County v. Duval Corp.,* 119 Ariz. 105, 579 P.2d 1075 (App.1978).

11. Federal Rule of Evidence 301 provides as follows:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

needed to burst a particular presumption bubble can be problematic. *See* Alexander L. Broadfoot, *Presumptions Under Arizona Law: Divining the Standards*, 35 Ariz. L.Rev. 1073, 1076–77 (1993) (discussing the difficulties in perceiving the burden-shifting effects of presumptions).

¶ 50 Arizona courts generally hold that a presumption is a procedural device that shifts the burden of producing contrary evidence to the party opposing the presumed fact but leaves the burden of persuasion on the proponent of the evidence. *Seiler*, 52 Ariz. at 548–49, 84 P.2d at 454–55 (citation omitted) (stating presumption is not evidence but an arbitrary rule directing "which party shall first go forward and produce evidence sustaining a matter in issue"); *see also Grilz*, 136 Ariz. at 455, 666 P.2d at 1064; *State Tax Comm'n v. Graybar Elec. Co.*, 86 Ariz. 253, 257–58, 344 P.2d 1008, 1012 (1959); *Silva*, 63 Ariz. at 370–71, 162 P.2d at 618; *State v. Nihiser*, 191 Ariz. 199, 203, 953 P.2d 1252, 1256 (App.1997) (citation omitted). However, as previously noted, *supra* ¶ 49, some presumptions shift to the party opposing the presumption the burden to persuade the court of the non-existence of the presumed fact. *See, e.g., Eng v. Stein*, 123 Ariz. 343, 346, 599 P.2d 796, 799 (1979) (presumption of community property); *Brown v. Ware*, 129 Ariz. 249, 251, 630 P.2d 545, 547 (App.1981) (presumption of adverse possession); *Coffman v. Coffman*, 121 Ariz. 522, 523, 591 P.2d 1010, 1011 (App.1979) (presumption of legitimacy). The courts in these cases do not explain why some presumptions shift the burden of persuasion rather than the burden of production, and we do not discern a common thread among the cases for doing so. As noted by one commentator, our inability to precisely group presumptions into ones shifting the burden of production and ones shifting the burden of persuasion is likely due to the fact that presumptions are created for unique reasons that are often inextricably intertwined with the pertinent substantive law. *McCormick on Evidence, supra* note 9, at § 344(C) (explaining that diversity of such considerations defies usable categorization). Consequently, we do not attempt to divine specific reasons underlying the burden-shifting effects of all presumptions. Instead, we adhere to the generally held view that a presumption serves to shift the burden of producing evidence, unless the substantive common law or legislative enactment giving rise to the presumption compels a conclusion that the presumption shifts the burden of persuasion to the party opposing the presumed fact.

¶ 51 Following the general rule, we agree with *Sheehan* that the heeding presumption shifts the burden of production rather than the burden of persuasion. 135 Ariz. at 238–39, 660 P.2d at 489–90. The court in *Dole Food* does not explain the basis for its view that the heeding presumption shifts the burden of persuasion, and we do not perceive such a basis. 188 Ariz. at 306, 935 P.2d at 884. Plaintiffs contended at oral argument that the inherent difficulties of proving that an information defect caused a product-related injury, coupled with the public's desire to encourage manufacturers to provide adequate warnings, create a public policy reason for deciding that the heeding presumption shifts the burden of persuasion. We disagree. Although presumably aware of such difficulties, our supreme court has nevertheless held that the plaintiff in a strict products liability case based on information defect bears the burden of proving that the manufacturer's failure to issue an adequate warning proximately caused the injury at issue. *Gosewisch*, 153 Ariz. at 403, 737 P.2d at 379. The court further recognized that the heeding presumption, without deciding its viability, merely reduces, not eliminates, that burden. *Id.* at 404, 737 P.2d at 380.

¶ 52 Based on the foregoing, the heeding presumption serves to shift the burden of production to the manufacturer. The manufacturer meets this burden by introducing evidence that would permit reasonable minds to conclude that the injured party would not have heeded an adequate warning. *See Helton v. Indus. Comm'n*, 85 Ariz. 276, 279, 336 P.2d 852, 853 (1959); *see also Silva*, 63 Ariz. at 372, 162 P.2d at 619; *Seiler*, 52 Ariz. at 548–49, 84 P.2d at 454–55. The court determines whether the manufacturer has rebutted the presumption and, if so, the presumption is destroyed, the existence or

non-existence of the presumed fact must be determined as if the presumption had never operated in the case, and the jury is never told of the presumption. *Grilz*, 136 Ariz. at 455, 666 P.2d at 1064. However, the jury may still draw reasonable inferences from the facts originally giving rise to the presumption. *McCormick on Evidence, supra* note 9, at § 344(A). We now decide whether the trial court in this case properly applied the heeding presumption.

¶ 53 GM introduced competent evidence to rebut the heeding presumption. The owner's manual for Mrs. Golonka's truck cautioned that before the driver leaves the vehicle, "to reduce the risk of personal injury as a result of vehicle movement," the driver should apply the parking brake, shift to park, shut off the engine, and remove the key. Despite this warning, Mrs. Golonka apparently did not set the parking brake, turn off the engine, or remove the key immediately prior to the accident. Mrs. Golonka also apparently ignored a buzzer that activated when she opened her door with the key still in the ignition. According to expert testimony elicited by GM, had Mrs. Golonka followed these steps, she would have prevented the accident.

¶ 54 Evidence that Mrs. Golonka ignored safety warnings that related to the accident would have allowed reasonable minds to conclude that she would have similarly ignored adequate warnings about mis-shifts. *See Gosewisch*, 153 Ariz. at 404, 737 P.2d at 380 (any heeding presumption rebutted by evidence that plaintiff injured in all-terrain vehicle accident ignored existing warnings about carrying passengers and wearing a helmet). The court therefore erred by instructing the jury on the presumption rather than finding that the presumption had spent its force. *Grilz*, 136 Ariz. at 455, 456 n. 3, 666 P.2d at 1064, 1065 n. 3.

¶ 55 Although we do not lightly overturn a jury's verdict, we are compelled to do so here because the erroneous jury instruction creates substantial doubt that the jurors were properly guided in their deliberations. *Gemstar*, 185 Ariz. at 504, 917 P.2d at 233. The success of Plaintiffs' information defect claim depended in significant part on their ability to prove that Mrs. Golonka would have heeded an adequate warning about mis-shifts, which in turn would have prevented her death. The evidence on this point was greatly disputed and vehemently argued to the jury by both Plaintiffs and GM. The jury's resolution of this disputed issue of fact may well have turned on who bore the burden of proving the fact. Thus, the court's instruction, which mistakenly shifted the burden to GM, prejudiced GM's substantial rights and requires a new trial on Plaintiffs' negligent failure-to-warn claim and their strict liability information defect claim. *Id.* (citation omitted).

¶ 56 In light of our decision, we need not address GM's additional contention that a new trial is required because the jury's comparative fault allocations reflect confused verdicts. Additionally, because different evidence may be adduced in a re-trial limited to the warnings-related claims, we do not address GM's contention that the jury's award of punitive damages was unwarranted. *See Progressive Specialty Ins. Co. v. Farmers Ins. Co. of Arizona*, 143 Ariz. 547, 548, 694 P.2d 835, 836 (App.1985) (holding appellate court should refrain from giving advisory opinions). However, we address GM's remaining contentions that are likely to arise on remand.

#### D. Other issues that may arise on remand

##### 1. Ronald Elwell's testimony

¶ 57 GM argues that the trial court erred by allowing former GM mechanical engineer Ronald Elwell to testify that GM had a policy in the 1980s to spend no more money on safety issues than required by applicable federal standards. Elwell also related that GM's reaction to a vehicle defect depended on "[t]he frequency of the defective performance times the consequences, which is cost to the American public, either in injuries or death." According to GM, the court should have precluded this testimony as irrelevant, lacking in foundation, and as improper character evidence.

¶ 58 After conducting an evidentiary hearing outside the presence of the jury, the trial

court ruled that the challenged aspect of Elwell's testimony was at least relevant to the claim for punitive damages and therefore admissible. The court additionally rejected GM's foundation argument by finding that Elwell had personal knowledge of the alleged GM policies. The court did not abuse its discretion by making these rulings. *Selby,* 134 Ariz. at 227, 655 P.2d at 347 (citation omitted).

¶ 59 According to Elwell, GM's minimal spending policy was irresponsible and hindered engineers' efforts to make GM vehicles as safe as possible. This evidence, coupled with evidence suggesting that GM knew about the mis-shift problem in the 1980s but ignored it, increases the probability that GM "consciously disregard[ed] the unjustifiabl[e] substantial risk of significant harm" to others, thereby justifying an award of punitive damages. *Thompson v. Better Bilt Aluminum Products Co.,* 171 Ariz. 550, 556, 832 P.2d 203, 209 (1992) (citation omitted). The evidence was therefore relevant. Ariz. R. Evid. 401.

¶ 60 The record also reflects that Elwell had personal knowledge of the GM policies at issue. Elwell testified that he worked in GM's Engineering Analysis Group, which investigated legal claims asserted against GM and knew GM's safety policies and procedures as part of his job. Elwell's superior informed him of the contested minimal-spending policy in the early 1980s and, according to Elwell, this policy was widely communicated to GM engineers. Additionally, Elwell stated he used GM's alleged defect-assessment policy when reporting fuel system problems to upper management. Based on this testimony, the court did not err by finding that Elwell had sufficient personal knowledge of GM's policies to testify about them. *See* Ariz. R. Evid. 602.

¶ 61 Finally, evidence of GM's policies in effect in the 1980s is not prohibited character evidence under Rule 404(a), Arizona Rules of Evidence. GM asserts that Elwell had no knowledge about transmission design and related warnings, and evidence of the contested policies was therefore necessarily confined to the areas of Elwell's job responsibilities. For this reason, GM con-

tends that evidence of the policies was impermissibly used to show that GM acted in conformity with this "corporate mentality" when addressing the mis-shift problem. But Elwell did not state that GM's policies were limited to a specific GM product division. Rather, he related that he needed to know GM's general safety policies and procedures. We therefore reject GM's contention.

## 2. State-of-the-art defense

¶ 62 GM also argues that the trial court erred by refusing to give a state-of-the-art defense jury instruction relating to written warnings. Section 12–683, A.R.S., provides, in pertinent part, as follows:

> In any product liability action, a defendant shall not be liable if the defendant proves that any of the following apply:
>
> 1. The defect in the product is alleged to result from inadequate design or fabrication, and if the plans or designs for the product or the methods and techniques of manufacturing, inspecting, testing and labeling the product conformed with the state of the art at the time the product was first sold by the defendant.

" 'State of the art' means the technical, mechanical and scientific knowledge of manufacturing, designing, testing or labeling the same or similar products which was in existence and reasonably feasible for use at the time of manufacture." A.R.S. § 12–681(8) (Supp.2002).

¶ 63 The trial court found that § 12–683(1) applied to allow GM to defend against the failure-to-warn/information defect claims by arguing that its active warning system (i.e., horn, flashing lights, buzzers) and on-product labeling were state of the art. However, the court ruled sufficient evidence did not support a state-of-the-art defense regarding written warnings. Consequently, although the court gave a state-of-the-art instruction concerning the active warning system and on-product labeling, the court told the jury to "not consider the state-of-the-art defense as to any claim whether product liability or negligence[ ] based on the alleged failure to provide adequate written warnings (other than on-prod-

uct labels)." GM contends the court erred by refusing to extend the state-of-the-art defense instruction to written warnings because sufficient evidence supported such an instruction.

¶ 64 A trial court must instruct the jury on all legal theories supported by the evidence. *Gemstar*, 185 Ariz. at 503, 917 P.2d at 232. We conclude, however, that the evidence did not support GM's request for a state-of-the-art instruction related to written warnings. GM's written warnings for the 1987 Sierra truck were state of the art only if the more specific warnings proposed by Plaintiffs were not "in existence and reasonably feasible for use at the time of manufacture." A.R.S. § 12–681(8). GM did not introduce evidence at trial that it was unaware of the risk of mis-shifts or that such warnings were not reasonably feasible or advisable. Instead, GM points to evidence that the owner's manual for the truck provided sufficient warnings in light of the need for and effectiveness of a more pointed warning relating to the possibility of mis-shifts. We agree with Plaintiffs and the trial court, however, that such evidence concerns whether an information defect existed or whether GM acted negligently by failing to warn of mis-shifts. This evidence does not demonstrate that issuing better written warnings was either not feasible or inadvisable. The trial court did not err by refusing to extend its state-of-the-art defense instruction to written warnings. In light of our decision, we need not consider Plaintiffs' alternative contention that the state-of-the-art defense is never applicable to failure-to-warn/information defect claims.

## CONCLUSION

¶ 65 For the foregoing reasons, we hold that the jury necessarily found GM at fault only for negligent failure to warn and strict liability information defect. The trial court correctly denied GM's motion for JMOL on these claims. The court also properly denied GM's request for a state-of-the-art defense jury instruction relating to the written warnings. However, although the court properly recognized the viability of the heeding presumption in Arizona, the court improperly instructed the jury on this presumption. Because this error prejudiced GM's substantial rights, we reverse and remand for a new trial on Plaintiffs' claims for negligent failure to warn and strict liability information defect.

CONCURRING: JOHN C. GEMMILL and G. MURRAY SNOW, Judges.