IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

IN RE TERMINATION OF PARENTAL RIGHTS AS TO B.W.

No. CV-24-0079-PR
Filed July 17, 2025

Appeal from the Superior Court in Maricopa County
The Honorable Sigmund G. Popko, Judge *Pro Tempore*
No. JS520409
**REVERSED AND REMANDED**

Memorandum Decision of the Court of Appeals, Division One
No. 1 CA-JV 23-0202
Filed March 19, 2024
**VACATED**

COUNSEL:

Sherri McGuire Lawson, Maricopa County Legal Defender, Jamie R. Heller (argued), Deputy Legal Defender, Phoenix, Attorneys for Jason M.

Joshua A. Barreda, Bonnie Platter (argued), Barreda Law, PLLC, Gilbert, Attorneys for Jessica W.

David J. Euchner (argued), Pima County Public Defender's Office, Tucson; Suzanne Sanchez, Maricopa County Office of the Public Advocate, Phoenix, attorneys for Amici Curiae Indigent Defense Agencies

Kristin K. Mayes, Arizona Attorney General, Autumn Spritzer, Assistant Attorney General, Tucson, AZ Attorneys for Amicus Curiae Department of Child Safety

JUSTICE BEENE authored the opinion of the Court, in which VICE CHIEF JUSTICE LOPEZ and JUSTICES BOLICK and KING joined.[*] CHIEF JUSTICE TIMMER dissented.

_____

JUSTICE BEENE, Opinion of the Court:

**¶1** The juvenile court may terminate a parent-child relationship if it concludes that the parent has abandoned the child and that termination of the relationship would be in the best interests of the child. *See Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 474 ¶ 1 (2023); A.R.S. § 8-533(B)(1). A parent abandons a child by failing "to provide reasonable support and to maintain regular contact with the child" and instead only making "minimal efforts to support and communicate with the child." A.R.S. § 8-531(1). The statute further provides that the parent's "[f]ailure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." *Id.*

**¶2** This Court granted review to determine the role of "just cause" within § 8-531(1). This first requires us to delineate the procedure for establishing abandonment as a ground for termination. Then, we must define what constitutes "just cause" under § 8-531(1). For the reasons discussed below, we reverse the juvenile court's termination order and remand the matter for reconsideration of the abandonment ground consistent with this Opinion.

## BACKGROUND

**¶3** B.W. was born to Mother and Father in early 2015. At the time, Mother and Father lived separately but continued a non-exclusive intimate relationship. Mother and Father co-parented B.W., but they frequently argued about his care.

**¶4** In August 2015, this already contentious family dynamic further soured. While Father's girlfriend's husband ("Husband") was on the phone with Mother, Husband entered Father's home with a knife.

_____

[*] Justice William G. Montgomery has recused himself from this matter. Before his retirement, Justice Robert Brutinel (Ret.) also recused himself from this matter.

While Mother was still on the call, Father shot and killed Husband. Mother later became a key prosecution witness in Father's homicide trial.

**¶5** Although Father was not immediately arrested or charged with a criminal offense, he retained a criminal defense attorney in October 2015. During this time, Father was not under any court-ordered restriction that prohibited him from contacting Mother or B.W. However, because Father's attorney anticipated that criminal charges would be filed, he advised Father not to contact Mother regarding B.W. Father's attorney believed that any attempt to contact Mother could be interpreted as Father's attempt to influence or intimidate a key prosecution witness, thereby compromising Father's defense in any future criminal case. Acting on this advice, Father's last contact with Mother regarding B.W. was in January 2016.

**¶6** In November 2016, Father was arrested and charged with first degree murder and conspiracy to commit first degree murder. After a brief period in custody, Father was released and ordered to have no contact with any witnesses in the case. While pending trial over the next several years, Father—who was not incarcerated for the vast majority of this time—did not take any further action to parent B.W., who remained in Mother's custody. Father was ultimately acquitted on all charges in December 2021.

**¶7** In March 2022, three months after his acquittal, Father initiated a family court action seeking to establish his parental rights as to B.W. Four months later, Mother commenced a juvenile court action seeking termination of Father's parental rights based on abandonment. *See* §§ 8-531(1), -533(B)(1). Father's family court proceedings were stayed pending resolution of Mother's termination action.

**¶8** After a four-day hearing, in which Father testified, the juvenile court concluded that Father had abandoned B.W. under § 8-533(B)(1). It found that Mother had established abandonment as a ground for termination by showing Father's absence from B.W.'s life for longer than the six-month period articulated in § 8-531(1) without just cause.

**¶9** The juvenile court rejected Father's arguments that he had "just cause" for his inaction. Though it acknowledged the extraordinary circumstances in the case, the court found that the unique nature of Father's

3

situation did not justify his failure to "quickly and vigorously" assert his rights to B.W. "even in the face of obstacles." The court noted that even though Father may have been acting in accordance with his criminal defense attorney's advice, Father's reliance on his attorney's advice did not "insulate him from the civil consequences of his abandonment of B.W.," especially when "no good reasons were offered as to why [Father's] available legal options were not explored in either the criminal court or in a parallel family court proceeding."

¶10        After finding clear and convincing evidence supporting abandonment, the juvenile court then concluded that termination of Father's parental rights was in B.W.'s best interest and therefore terminated his parental rights. Father appealed.

¶11        The court of appeals affirmed. *In re Termination of Parental Rts. as to B.W.*, No. 1 CA-JV 23-0202, 2024 WL 1172862, at *1 ¶ 1 (Ariz. App. Mar. 19, 2024) (mem. decision) ("*In re B.W.*"). The court rejected Father's argument that he rebutted the abandonment presumption by demonstrating "just cause" under § 8-531(1). *Id.* at *3 ¶ 17. The court determined that Father's failure to pursue legal action to establish his parental rights and obligations for six years and decision to follow the advice of his criminal defense attorney, who did not practice family or juvenile law, did not excuse his inaction. *Id.* ¶¶ 18–19. The court of appeals held that Father was "mistaken" in asserting that "just cause" functioned as "an exception to abandonment." *Id.* ¶ 18. The court noted that "Father had to do *something* if he wanted to preserve the parental relationship, and instead he chose to do nothing." *Id.* ¶ 19. Accordingly, it concluded that the juvenile court did not err in finding that Mother established abandonment under §§ 8-531(1) and -533(B)(1) by clear and convincing evidence. *Id.*

¶12        We granted Father's petition for review to provide guidance on what constitutes "just cause" under § 8-531(1) and to clarify the procedure for establishing prima facie evidence of abandonment under the statute, both recurring issues of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

### I.

**¶13**        Juvenile courts apply a two-step analysis in determining whether to terminate a parent-child relationship. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474 ¶ 13 (2022). First, the court must decide whether clear and convincing evidence supports at least one ground for termination listed in § 8-533(B). *Id.* Second, the court must determine whether a preponderance of evidence supports a finding that termination is in the child's best interests. *Id.*

**¶14**        We will affirm a juvenile court's termination order unless it is clearly erroneous. *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 580 ¶ 10 (2021). A decision is clearly erroneous if, as a matter of law, "no one could reasonably find the evidence to be clear and convincing." *Brionna J.*, 255 Ariz. at 479 ¶ 31 (quoting *Murillo v. Hernandez*, 79 Ariz. 1, 9 (1955)). Whether abandonment has been established is necessarily a question of fact for the trial court. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250 ¶ 20 (2000). But statutory interpretation presents a question of law, which we review de novo. *Brionna J.*, 255 Ariz. at 476 ¶ 17.

### II.

**¶15**        Termination of parental rights is governed by § 8-533, which sets forth various grounds for termination—including abandonment. § 8-533(B)(1). Mother's petition for termination alleged abandonment as the basis to terminate Father's parental rights. The statutory definition of "abandonment" provides:

> "Abandonment" means the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

§ 8-531(1). Determining the procedure for establishing abandonment and the meaning of "just cause" are matters of statutory interpretation.

**¶16** "We interpret statutes 'in view of the entire text, considering the context and related statutes on the same subject.'" *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 142 ¶ 15 (2024) (quoting *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019)). Courts will read each word, phrase, clause, and sentence in a manner that ensures "no part of the statute is void or trivial" and will give meaning to the statute's clear and unequivocal language. *Id.* "Under this plain meaning analysis, '[w]e look first to the language of the provision, for if the [statutory] language is clear, judicial construction is neither required nor proper.'" *Id.* (alterations in original) (quoting *Perini Land & Dev. Co. v. Pima County*, 170 Ariz. 380, 383 (1992)). Additionally, statutory terms are given their commonly accepted meanings absent legislative definitions or indication from context that a special meaning was intended. *Id.* ¶ 16.

### III.

**¶17** We first clarify the procedure for establishing abandonment. The plain language of § 8-531(1) provides that "prima facie evidence of abandonment" is established if a parent fails to maintain a "normal parental relationship" with the child for six months without "just cause." Though this Court has not previously addressed what "prima facie evidence" means in the context of establishing abandonment, Arizona courts have held in other contexts that prima facie evidence establishes a presumption. *E.g.*, *State ex rel. Horne v. AutoZone, Inc.*, 227 Ariz. 471, 479 ¶ 21 (App. 2011) (explaining "[p]rima facie evidence is not evidence at all but rather is a presumption of law that, in the absence of evidence to the contrary, allows the trier of fact to presume the existence of a fact based on proof of other facts"), *vacated in part on other grounds*, 229 Ariz. 358 (2012). But the effect of a presumption is limited: "Whenever evidence contradicting a legal presumption is introduced the presumption vanishes." *Silva v. Traver*, 63 Ariz. 364, 368 (1945), *overruled on other grounds by Reed v. Hinderland*, 135 Ariz. 213, 219 (1983); *see Barlage v. Valentine*, 210 Ariz. 270, 277 ¶ 27 (App. 2005) ("Prima facie evidence of a particular fact raises a rebuttable presumption of, but does not conclusively establish, that fact.").

**¶18** Under these principles, a parent establishes "prima facie evidence of abandonment"—and thereby a presumption—by showing that

the other parent failed to maintain a normal parental relationship for six months without just cause. As part of this preliminary burden of production, the parent seeking termination must allege facts sufficient to support each of these elements: (1) failure to maintain a normal parental relationship; (2) for six months; and (3) without just cause. The other parent may rebut this presumption by showing just cause or by presenting other evidence that disproves the alleged failure to maintain a normal parental relationship, at which point the presumption "vanishes." *See Silva*, 63 Ariz. at 368; *Golonka v. Gen. Motors Corp.*, 204 Ariz. 575, 589 ¶ 48 (App. 2003). Once the other parent presents such evidence, the presumption's "'bubble is burst,' and the existence or non-existence of the presumed fact must be determined as if the presumption had never operated in the case." *Golonka*, 204 Ariz. at 589 ¶ 48. Thus, a presumption of abandonment established under § 8-531(1) can be defeated if the parent demonstrates "just cause" for failing to maintain a normal parental relationship with the child.

**¶19** It is important to note that even if the presumption of abandonment does not apply, termination may still be proper. Abandonment can still be proven despite the absence of an abandonment presumption under § 8-531(1) if the other parent failed to "provide reasonable support and to maintain regular contact with the child, including providing normal supervision," for a sustained period. However, as in the case where abandonment is presumed, if a parent can show "just cause" for failing to maintain a normal parental relationship under the circumstances, the claim of abandonment fails as unproven. Although § 8-531(1) does not expressly reference the role of just cause outside of a presumption of abandonment, the statute necessarily implies that just cause may also overcome evidence that would otherwise suggest abandonment even when the abandonment presumption does not apply. *See Hoyle v. Superior Court*, 161 Ariz. 224, 227 (App. 1989) ("What a statute necessarily implies is as much a part of the statute as what the statute specifically expresses."). By including durational and just cause components within the presumption, § 8-531(1) necessarily implies that abandonment occurs when, over a sustained period of time, a parent fails to provide reasonable support to the child and maintain regular contact with the child, including normal supervision, and does not establish just cause. The presumption, with its six-month requirement and "without just cause" component, is simply an evidentiary shortcut for fulfilling the definition of abandonment in the first sentence of the statute. Showing the presumption proves abandonment absent a contrary showing by the other

parent. It necessarily and logically follows, therefore, that abandonment includes a sustained period where a parent fails to provide reasonable support or maintain regular contact, including normal supervision, and the parent fails to show just cause. Therefore, contrary to the court of appeals' holding, "just cause" is an exception to abandonment. *See In re B.W.*, 2024 WL 1172862, at *3 ¶ 18.

**¶20** We pause here to clarify the procedure the juvenile court should apply when determining the applicability of § 8-531(1)'s presumption. As detailed above, when prima facie evidence of abandonment is presented, it creates a presumption in favor of the parent seeking termination that the other parent failed to maintain a normal parental relationship. At that point, the burden of production shifts to the other parent to rebut the presumption of abandonment. *See In re Pima Cnty. Juv. Action No. S-1182*, 136 Ariz. 432, 433 (App. 1983) (concluding father's evidence sufficient to "rebut the presumption" of abandonment). The burden of persuasion, however, never shifts from the parent seeking termination. *See Golonka*, 204 Ariz. at 590 ¶ 50 (concluding that "a presumption is a procedural device that shifts the burden of producing contrary evidence to the party opposing the presumed fact but leaves the burden of persuasion on the proponent of the evidence"); *see also* Ariz. R. Evid. 301 ("In a civil case, unless a statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.").

**IV.**

**¶21** We now turn to interpreting "normal parental relationship" and "just cause."

**¶22** Although § 8-531(1) does not expressly define "normal parental relationship," the plain meaning of "normal parental relationship" is informed by the first two sentences of the statute. Reading § 8-531(1) as a whole, "abandonment" signifies the "[f]ailure to maintain a normal parental relationship." Because "abandonment" means "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision," it logically follows that a "normal parental relationship" exists when a parent provides the support

and contact with the child that a parent who abandoned the child has failed to offer.

**¶23** Next, we determine the meaning of "just cause" within the context of abandonment. "Just cause" is not statutorily defined, and this Court has not previously interpreted this term within the context of termination actions. Absent a statutory definition, this Court interprets words in accordance with their ordinary meaning. *Chaparro v. Shinn*, 248 Ariz. 138, 141 ¶ 14 (2020). Contemporary dictionary definitions may be used to help define terms within their statutory context. *See Garibay v. Johnson*, 565 P.3d 236, 243 ¶ 24 (Ariz. 2025) ("Absent a statutory definition, we may consider dictionaries and written publications to discern the word's common meaning and usage, respectively, at the time the legislature enacted the statute.").

**¶24** When the legislature initially enacted § 8-531(1) in 1970,[1] and when it subsequently recodified the current version of the statute in 1994, "just cause" was defined as "a cause outside legal cause, which must be based on reasonable grounds" and "[f]air, adequate, reasonable cause" that is "regulated by good faith." *Just Cause*, Black's Law Dictionary (4th ed. 1961); *Just Cause*, Black's Law Dictionary (6th ed. 1989); *Just Cause*, Ballentine's Law Dictionary (3d ed. 1969) (defining "just cause" as "[a] legal cause; a fair cause relied upon in good faith"). These definitions align with standard dictionary definitions of "just" and "cause" separately. "Just" refers to something that is "legal or lawful," "reasonable," "justified," and "in accordance with law and justice." *Just*, Black's Law Dictionary (4th ed. 1961); *Just*, Webster's Third New Int'l Dictionary (1966). "Cause" refers to "a reason or motive for action or condition." *Cause*, Webster's Third New Int'l Dictionary (1966). Essentially, "just cause" refers to a reasonable and justifiable reason for an action—or in our case, inaction. We conclude that parents have "just cause" when they had a reasonable and fair justification for not maintaining a normal parental relationship with the child and relied on that justification in good faith.

**¶25** In determining whether "just cause" exists, the juvenile court should continue to examine whether the parent is acting to maintain a

---

[1] In 1970, § 8-531(1), defining "abandonment," was initially codified at A.R.S. § 8-546(1) and was subsequently recodified to be a part of § 8-531 by the passage of H.B. 2462, 41st Leg., 2d Reg. Sess. (Ariz. 1994).

normal parent-child relationship. *See Michael J.*, 196 Ariz. at 249–50 ¶ 18, 250 ¶ 22. However, this is only one factor that should be considered in evaluating a parent's ability to perform their parental obligations. *Id.* This Court in *Michael J.* stated that when "circumstances prevent the . . . father from exercising traditional methods of bonding with his child, he . . . must vigorously assert his legal rights to the extent necessary." *Id.* (first alteration in original) (quoting *In re Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 97 (1994)). While the father must actively assert his legal rights to the extent necessary, the juvenile court must also consider additional facts and circumstances that may have fairly and reasonably impacted his understanding of what conduct was feasible and any resulting consequences. In *Michael J.*, the father was serving a lengthy prison sentence but faced no obvious legal impediments or consequences for engaging with his child to the degree possible during his incarceration. *See id.* at 247 ¶ 3, 251 ¶ 24. However, in cases that present additional factors that may impact a parent's ability or belief as to his ability to assert his rights, the juvenile court must also consider these factors when determining whether a parent failed to maintain a normal parental relationship.

¶26 Accordingly, in making the "just cause" determination, the juvenile court should examine what a parent has done to facilitate a normal parental relationship in accordance with *Michael J.*, but it must also consider that the parent's conduct—or ability to "do something"—may be affected by a parent's reasonable, good faith belief that circumstances exist that preclude the parent from exercising traditional methods of maintaining a normal parental relationship.

## V.

¶27 Applying the definition of "just cause" to the case before us, Father does not dispute that sufficient evidence created a presumption under § 8-531(1) that he abandoned B.W. Rather, Father contends that he did not take any action to parent B.W.—such as contacting Mother, pursuing modification of his pretrial release conditions to see his child, or filing an action in family court to establish parenting time—because his criminal defense attorney advised him that these acts would likely jeopardize his chance of prevailing at his criminal trial. Father acknowledges that he failed to maintain a normal parental relationship with his child for more than six years. However, he argues that the

termination should be reversed because he rebutted the abandonment presumption by showing "just cause" under the statute.

¶28 The juvenile court rejected Father's argument that he had "just cause" for his inaction. As previously noted, the court determined that Father failed to act "quickly and vigorously even in the face of obstacles to establish a parent-child relationship." It concluded that even with the ongoing first degree murder prosecution, Father's reliance on his criminal defense attorney's advice "does not insulate him from the civil consequences of his abandonment." The court of appeals agreed and held that "reasonable evidence supports the juvenile court's finding that Father failed to show 'just cause' for his decision to forgo the parental relationship." *In re B.W.*, 2024 WL 1172862, at *3 ¶ 18.

¶29 The record on appeal is unclear as to what specific advice Father received from his criminal defense attorney, the nature of Father's pretrial release conditions, and the attendant circumstances that may have influenced what he believed he could do to maintain a normal parental relationship with B.W. given his perceived legal jeopardy. In light of this imprecise factual background, we remand the matter to the juvenile court. Although we express no opinion on the merits of the question on remand, the court should consider the definition of "just cause" as explained in this opinion in determining whether a reasonable person in Father's place, acting in good faith reliance on his criminal defense attorney's advice, would have decided not to maintain a normal parental relationship with his child.

¶30 Our dissenting colleague suggests that "[t]he record is clear and adequately supports the finding that Father abandoned B.W." *Infra* ¶ 36. The dissent then states that the record clearly demonstrates that Father's criminal defense attorney advised him not to contact Mother in any way, that Father's release conditions only prevented him from contacting witnesses and not B.W., and that "Father ultimately chose inaction" despite receiving advice regarding alternate legal options from his family law attorney. *Infra* ¶¶ 38–40. However, while the record reflects the general nature of the advice Father received, it does not indicate what alternate legal options Father's family law attorney provided or whether these options may have conflicted with his criminal defense attorney's instructions not to have any contact with Mother. Further, although the pretrial release order did not prohibit Father from contacting B.W., it is

difficult to imagine how Father could contact B.W.—who was a young child at the time—without any contact with Mother. It is also unclear whether Father knew he could have moved to modify his release conditions to permit him to contact B.W. through Mother. Additional circumstances may have also affected Father's understanding of what he could legally and reasonably do to assert his parental rights.

¶31 The dissent would conclude that there was no just cause here because "Father chose to do nothing" despite the availability of "other avenues" of asserting his parental rights. *Infra* ¶¶ 46, 48–49. This reliance on *Michael J.*'s requirement that a parent "do something" is inapposite because, unlike the father in *Michael J.* who faced no legal impediments to his ability or perceived ability to "do something," Father's conduct may have been affected by a reasonable, good faith belief that he was precluded from taking action. Additionally, as noted above, the record does not detail what additional avenues were available, whether Father fully understood how to pursue these steps, or whether the advice from his two attorneys conflicted. The dissent also notes that "Father's own actions undermine his claim that he was hamstrung by his reliance on defense counsel's advice" because he sometimes disregarded this advice to ask Mother about visiting B.W. *Infra* ¶ 46. However, Father contacted Mother against his attorney's advice *before* he was criminally charged. We believe that disregarding his attorney's advice *before* he was criminally charged should not conclusively preclude a finding of just cause predicated on Father's reliance on his attorney's advice *after* he was charged with first degree murder. A juvenile court may conclude that, after he was charged, Father reasonably decided not to jeopardize his defense in a now-pending criminal proceeding upon realizing that a conviction would further hinder his ability to establish a parental relationship.

¶32 Because the juvenile court did not have the benefit of the definition of just cause articulated in this Opinion, it could not have addressed what Father reasonably believed he could do to establish and nurture a parental relationship with B.W. Instead, the juvenile court was left to focus entirely on possible courses of action Father could have taken in hindsight. As noted above, when determining whether a parent had just cause, a juvenile court must now consider the parent's reasonable, good faith belief that circumstances exist that preclude the parent from exercising traditional methods of maintaining a normal parental relationship.

Therefore, remanding this case is appropriate to allow the court to consider the facts in the record and apply this Opinion's definition of just cause.

**¶33** In balancing the parent's liberty interest in "the care, custody, and management" of their children with the state's interest in protecting the stability of the parent-child relationship, our interpretation of § 8-531(1) continues this Court's adherence to the important constitutional precept that parental rights "do[] not evaporate simply because" the parent has "not been [a] model parent[]." *Jessie D.*, 251 Ariz. at 579 ¶ 8, 581 ¶ 17 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). The circumstances and resulting conduct surrounding a fractured parent-child relationship—occurring either by choice or through neglect—should be thoroughly examined by the juvenile court before it terminates a parent's rights because "[f]ew forms of state action are both so severe and so irreversible." *Santosky*, 455 U.S. at 759. We believe § 8-531(1) requires such an application as a matter of textual meaning and constitutional principle.

## CONCLUSION

**¶34** We reverse the juvenile court's order terminating Father's parental rights to B.W. and remand for a new determination applying the standards set forth in this Opinion. We vacate the court of appeals' memorandum decision.

TIMMER, C.J., dissenting.

¶35        Although I agree with the majority's articulation of the applicable framework for assessing abandonment under A.R.S. § 8-531(1), I respectfully disagree that a remand is warranted.

¶36        My colleagues do not identify any legal error made by the juvenile court in finding that Father lacked just cause for not maintaining a normal parental relationship with B.W. during Father's lengthy criminal proceedings.  In fact, consistent with the majority's own definition of "just cause," *see supra* ¶¶ 24–26, the juvenile court carefully examined Father's ability to "do something" in light of his reliance on defense counsel's advice.  Despite this, the majority finds the record too ambiguous to determine whether reasonable evidence supports the court's judgment, necessitating remand. *See supra* ¶ 29.  I disagree.  The record is clear and adequately supports the finding that Father abandoned B.W.  Accordingly, I would affirm the judgment terminating his parental rights.

## A.  The Record Is Clear

¶37        The majority concludes that the record is "unclear as to [1] what specific advice Father received from his criminal defense attorney, [2] the nature of Father's pretrial release conditions, and [3] the attendant circumstances that may have influenced what he believed he could do to maintain a normal parental relationship with B.W. given his perceived legal jeopardy." *See supra* ¶ 29.  But the extensive evidentiary record—comprising five days of testimony and exhibits—provides clarity on each of these points.

¶38        First, there is no ambiguity regarding defense counsel's advice.  The attorney testified that he consistently advised Father not to contact Mother in any way—whether to arrange visitation, send gifts or money, or otherwise reach out—lest he be accused of attempting to influence a key prosecution witness.  Father confirmed that this was the advice he received and added that the attorney also advised him against pursuing enforcement of his parenting rights in court.

¶39        Second, the testimony confirmed that while Father's pretrial release conditions barred him from contacting witnesses, including Mother, they did not prevent contact with B.W., nor did they bar him from seeking

family court intervention to establish contact. Also, there was no protective order in place preventing Father from contacting B.W.

¶40　　　　Third, Father testified extensively about "the attendant circumstances" surrounding his decision to disengage from B.W. while the criminal case was pending. He relied on defense counsel's stark warning that contact with Mother could result in criminal liability, also believing that Mother was intent on physically harming him. He acknowledged consulting a family law attorney associated with his defense counsel and who knew about the defense attorney's advice. The family law attorney nevertheless offered legal options Father could pursue to see B.W., yet Father ultimately chose inaction, which he described as the most difficult decision of his life. He later told a social study provider that he refrained from parenting efforts not just to heed legal advice, but because he feared incarceration would later harm any bond with B.W. he managed to form.

¶41　　　　The majority does not identify what more is needed to clarify the evidence presented to the juvenile court. Notably, the judge expressed no confusion and accepted as true that Father followed his defense attorney's advice. And the only way to gain more factual clarity is to reopen the evidentiary proceedings and give Father an undeserved second bite of the apple at showing just cause for not providing reasonable support for B.W. or maintaining regular contact with him, including normal supervision, for more than six years. In my view, nothing will be accomplished by a remand.

## B.  Reasonable Evidence Supports The Judgment

¶42　　　　Whether Father abandoned B.W. pursuant to § 8-531(1) is a factual question for the juvenile court. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250 ¶ 20 (2000). This Court defers to such findings if supported by reasonable evidence. *See Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478 ¶ 30 (2023). That standard is met here.

¶43　　　　I agree with the majority that just cause exists if a parent has "a reasonable and fair justification" for their inaction and relies on that justification in good faith. *See supra* ¶ 24. The critical inquiry here is whether Father's reliance on defense counsel's advice justified his failure to financially support B.W. or maintain contact with him for more than six years.

¶**44**         We evaluate Father's conduct—not his subjective intent—and ask what a reasonably prudent person in his circumstances would have done. *See Michael J.*, 196 Ariz. at 250 ¶ 18. Applying that test, I agree with the court of appeals that reasonable evidence exists to support the juvenile court's finding that Father's decision to forego a parental relationship with B.W. for so long, even in the face of his defense attorney's advice, was unjustified. *See In re Termination of Parental Rts. as to B.W.*, No. 1 CA-JV 23-0202, 2024 WL 1172862, at *3 ¶ 18 (Ariz. App. Mar. 19, 2024) (mem. decision).

¶**45**         Father indisputably failed to provide any financial support for B.W.—even through a third party—or maintain even minimal contact with him for more than six years. He sent no cards, gifts, or messages. Even assuming a temporary pause in contact may have been prudent early in the criminal investigation, that does not justify Father's long-term failure to pursue lawful avenues for maintaining a connection with his son. Although Father was in a tough spot, B.W. was far too young to wait more than six years for Father's legal troubles to resolve before having a father in his life.

¶**46**         Father's own actions undermine his claim he was hamstrung by his reliance on defense counsel's advice. He disregarded that advice at times by contacting Mother to ask about visiting B.W. Moreover, he sought advice from a family law attorney and was told there were "things he could do" to assert his rights. Instead of exploring those steps, however, Father chose to do nothing.

¶**47**         The majority dismisses these actions because Father followed his criminal defense attorneys' advice *after* formal charges were filed. *See supra* ¶ 31. It theorizes that "[a] juvenile court may conclude that, after he was charged, Father reasonably decided not to jeopardize his defense in a now-pending criminal proceeding upon realizing that a conviction would further hinder his ability to establish a parental relationship." *See supra* ¶ 31. But the juvenile court here had all this evidence before it and did not reach that conclusion. The majority fails to explain why we should not defer to the juvenile court on that point. *See Brionna J.*, 255 Ariz. at 478 ¶ 30. Indeed, the court may have given little weight to Father's decision to follow the defense attorney's advice after charges were filed, because charges were not filed until more than a year after the attorney first gave the advice. That

left approximately fifteen months during which Father—without any pending charges—still chose to do nothing after last seeing B.W.

**¶48**     Although Father faced a difficult situation, with Mother a key prosecution witness and serious charges pending, his reliance on his defense strategy cannot justify years of disengagement. He had other avenues—such as requesting a DNA test, registering with the putative father registry, or initiating a paternity action—that required no direct contact with Mother and posed no credible risk he would be accused of witness tampering. And as the juvenile court explained, Father could have explored ways in either the family court or the criminal court to have a relationship with his son without contacting Mother or being accused of attempting to influence or intimidate her.

**¶49**     We have repeatedly emphasized that a parent "must act persistently" to establish and maintain a relationship with his child; "must vigorously assert his legal rights to the extent necessary"; and "do something, because conduct speaks louder than words or subjective intent." *See Michael J.*, 196 Ariz. at 250 ¶ 22 (quoting *In re Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 97 (1994)). Here, Father did nothing. Considering the unexplored pathways to "doing something" that would not have involved contacting Mother or risking the success of his defense of the criminal charges, I cannot say the juvenile court's finding was in error. *See In re Yuma Cnty. Juv. Ct. Action No. J-87-119*, 161 Ariz. 537, 539–40 (App. 1989) (finding no just cause for father failing to maintain a normal parenting relationship even though mother hid child and severed ties where father made no effort to find the child), *cited with approval in Action No. S-114487*, 179 Ariz. at 99; *cf. Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 80 ¶¶ 15–17 (App. 2001) (finding that parents' election not to participate in reunification services due to alleged conflict with Fifth Amendment rights and on advice from attorneys defending them in prosecution for murdering another child did not excuse parents' inaction).

**¶50**     I would affirm the judgment terminating Father's rights to B.W. Therefore, with great respect for my colleagues, I dissent.